ETHICON ENDO–SURGERY, Plaintiff,

v.

**UNITED STATES SURGICAL
CORP., Defendant.**

Civ. No. C–1–94–74.

United States District Court,
S.D. Ohio,
Western Division.

Aug. 31, 1995.

Gerald Sobel, Aaron Stiefel, Daniel P. Di-Napoli, Kaye, Scholer, Fierman, Hays & Handler, New York City, Robert A. Pitcairn, Jr., Katz, Teller, Prant & Held, Cincinnati, Ohio, for the plaintiff.

Eric J. Lobenfeld, Drew M. Wintringham, Chadbourne & Parke, New York City, Gerald V. Weigle, Jr., Dinsmore & Shohl, Cincinnati, Ohio, for the defendant.

### ORDER CONSTRUING CLAIMS 6 & 24 OF THE FOX PATENT, FINDING NO INFRINGEMENT, AND DISMISSING CASE

SPIEGEL, Senior District Judge.

This matter is before the Court for the purpose of construing the language of Claims 6 and 24 of United States Reissue Patent Number Re. 34, 519 (the "Fox Reissue Patent").

### HISTORY OF THE LAWSUIT

Ethicon Endo–Surgery ("Ethicon") filed this lawsuit claiming that the Defendant United States Surgical ("U.S. Surgical" or "USSC") was infringing Ethicon's Fox Reissue Patent. U.S. Surgical counterclaimed asserting that the Fox Patent was invalid, that Ethicon's devices infringed U.S. Surgical's United States Patent Number 5,031,814 (the "Tompkins Patent"), and that Ethicon's devices infringed U.S. Surgical's United States Patent No. 5,156,315 (the "Green '315 Patent").

On March 21 and 22, 1994, the Court held a hearing on the Plaintiff's Motion for a Preliminary Injunction. Final arguments were heard on April 4, 1994. We denied the Plaintiff's motion. *See Ethicon Endo–Surgery v. United States Surgical Corp.*, 855 F.Supp. 1500 (S.D.Ohio, 1994). The case was set for Summary Jury Trial on April 10, 1994. On the eve of the summary jury trial, the Court of Appeals for the Federal Circuit issued its opinion in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) (holding that claim construction is a matter of law for the court to determine). The Parties agreed that the *Markman* decision significantly diminished the value of a summary jury trial. At the request of Ethicon, the Court agreed to conduct a hearing to aid in the interpretation of the claims at issue. That hearing was conducted during the week of August 7, 1995. The Court heard testimony for five days. Additionally, the Parties supplied the Court with proposed findings of fact and conclusions of law. Having had the benefit of this additional guidance, we remain convinced that our initial impression was correct. We determine that Claims 6 and 24 of the Fox Reissue Patent should be narrowly construed. Under this construction, we find no infringement on the part of U.S. Surgical's devices. Therefore, Ethicon's claim for infringement must be dismissed.

At the hearing held during the week of August 7, 1995, the Parties discussed the possible course of this case subsequent to the Courts decision concerning the meaning of Claims 6 and 24 of the Fox Reissue Patent. Counsel for the U.S. Surgical asserted that it was U.S. surgical's position that a finding that U.S. Surgical's devices did not infringe the Fox Reissue Patent would end this litigation, despite U.S. Surgical's Counterclaims. Since, the focus of the August hearing was the Fox Patent, we are not prepared to decide U.S. Surgical's counterclaims, at this point. However, in light of U.S. Surgical's express desire not to pursue its counterclaims, if we found no infringement of the Fox Patent, we will dismiss U.S. Surgical's Counterclaims, without prejudice.

At the very beginning of this lawsuit, even before the Preliminary Injunction Hearing, we summoned before the Court, top executives of the disputants. Ethicon was represented by Robert Croce, from Ethicon's parent company Johnson & Johnson. U.S. Surgical was represented by Bruce Lustman. The Court assured these gentlemen of its conviction that the United States District

Courts should be freely available to resolve disputes. We acknowledged the sanctity of the patent system, and the right of a patent holder to assert, through the courts, its exclusive privilege to practice its invention. We confirmed the Court's willingness to dedicate its full resources to the resolution of this dispute. However, we suggested that these two companies, who have brought so many welcome advances in the surgical field, should explore the possibility of evolving a more efficient and dependable structure for resolving their disputes. The parties themselves are the true experts in this complex and sophisticated medical field. Litigation, though time proven and reliable from one point of view, can be a protracted and clumsy way of resolving disputes in a field where innovation and technology are moving forward at a staggering pace. The Parties discussed the creation of a mediation or arbitration system under the auspices of a mutually respected master or panel of masters. Such a system could provide swift and expert resolution of these litigants chronic patent disputes, with much less expenditure of resources. The Parties could structure such a dispute resolution mechanism to their liking, providing for a range of outcomes from strict enforcement of patents to cross licensing, with a variety of other options only they would be able to imagine so long as none violated the anti-trust laws. Both Ethicon and U.S. Surgical indicated an interest in exploring such a system and have reported to the Court on further discussions in that direction. However, they determined to proceed forward with this particular issue in the form of a traditional lawsuit, which of course is their absolute right. We hope that the seeds which were planted at the commencement of this suit may bear some fruit in the future.

### MARKMAN V. WESTVIEW INSTRUMENTS INC.

In *Markman*, the Court of Appeals for the Federal Circuit stated that "the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman*, 52 F.3d at 979. The *Markman* court proceeded to explain the method a district court should use:

"To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991).... "Expert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used." *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987).

\* \* \* \* \* \*

Claims must be read in view of the specification, of which they are a part. The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.... The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of the claims.

To construe claim language, the court should also consider the patent's prosecution history.... The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims....

*Markman,* 52 F.3d at 979–80 (some citations omitted). At our August hearing, the Parties made in depth presentations, providing the Court with precisely the information suggested by the Federal Circuit.

### DISCUSSION

This is a dispute concerning surgical linear cutter-staplers. These instruments are used by surgeons to simultaneously cut and staple tissue. In particular the Plaintiff, Ethicon, asserts that the linear cutter-staplers which are marketed by the Defendant, U.S. Surgical, infringe one of the Plaintiff's patents. The patent in question covers a lockout device. This device prevents a surgeon from inadvertently cutting tissue without having the cutter loaded with staples.

An infringement analysis entails two steps. The first step is determining the meaning

and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing.

*Markman,* 52 F.3d at 976.

In rendering our decision of this matter, we have considered the testimony of the witnesses, the documents admitted into evidence, the Plaintiff's proposed findings of fact and conclusions of law (doc. 160), and the Defendant's proposed findings of fact and conclusions of law (doc. 162), and joint proposed findings of fact and conclusions of law (doc. 42).

In weighing the testimony of the witnesses, we considered each witness' relationship to the Plaintiff or to the Defendant; his interest, if any, in the outcome of the trial; his manner of testifying; his opportunity to observe or acquire knowledge concerning facts about which he testified; and the extent to which his testimony was supported or contradicted by other credible evidence.

Under Federal Rule of Civil Procedure 52, we set forth our findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. The Parties

1. Plaintiff Ethicon Endo-Surgery ("Ethicon") is a general partnership formed under the laws of the State of New Jersey with its principal place of business in Cincinnati, Ohio. Both the general partners are subsidiaries of Johnson & Johnson, Inc. Ethicon develops, manufactures and sells mechanical wound-management products.

2. Defendant United States Surgical Corporation ("U.S. Surgical") is a Delaware corporation with its principal place of business in Norwalk, Connecticut. U.S. Surgical is doing business in Ohio. U.S. Surgical develops, manufactures and sells mechanical wound-management products.

3. U.S. Surgical began selling mechanical wound-management products before Ethicon. U.S. Surgical first began selling surgical staplers in the late 1960's. The company has devoted significant resources to research and development and has regularly improved its products over the years. In addition U.S. Surgical has sponsored surgical training programs, in which surgeons learn to use its surgical staplers. U.S. Surgical has been a pioneer in the development of endoscopic surgery, a technique for minimally intrusive surgery, which allows speedy recovery and reduces hospital stays. U.S. Surgical was the first to market a linear cutter with a lockout device.

4. Ethicon, though second in the market has become a vigorous competitor of U.S. Surgical. Ethicon is a subsidiary of Johnson & Johnson, Inc. which manufactures among its many products, surgical sutures and other products used in surgery.

5. Together U.S. Surgical and Ethicon account for substantially the entire market for surgical liner cutter-staplers.

### II. The Parties' Patents

#### A. *The Fox Patent.*

6. The earliest embodiment of the patented Fox lockout mechanism was conceived in November 1987.

7. In November 1988, Ethicon filed the application which led to the issuance of the original Fox patent in the names of William D. Fox, Rudolph H. Nobis, Richard P. Nuchols and Mark S. Zeiner.

8. On January 9, 1990, the United States Patent and Trademark Office (the "PTO") issued to Ethicon, Inc. United States Letters Patent No. 4,892,244 (the original "Fox Patent"), for an invention entitled "SURGICAL STAPLER CARTRIDGE LOCKOUT DEVICE." The original Fox patent included Claim 6 which is now at issue in this suit.

9. The Fox Patent describes a lockout device "in a staple cartridge."

10. Ethicon has never practiced the Fox Patent commercially.

11. In testing the prototypes of the Fox Patent, Ethicon did not actually test the lockout under actual conditions of surgery.

#### B. *The Tompkins Patents.*

12. The patented Tompkins lockout mechanism was conceived after November 1987, but no later than May/June 1988.

13. In May 1989, U.S. Surgical filed the application which led to the issuance of the first Tompkins patent in the names of Thomas M. Tompkins and Dominic F. Presty.

14. On September 10, 1990, the PTO issued to U.S. Surgical United States Letters Patent No. 4,955,959 (the "Tompkins '959 Patent) for an invention entitled "LOCKING MECHANISM FOR SURGICAL FASTENING APPARATUS."

15. On July 16, 1991, the PTO issued to U.S. Surgical United States Letters Patent No. 5,031,814 (the "Tompkins '814 Patent) upon an application filed in the names of Thomas M. Tompkins and Dominic F. Presty, for an invention entitled "LOCKING MECHANISM FOR SURGICAL FASTENING APPARATUS."

### C. *Other Relevant Patents*

16. U.S. Surgical introduced the first cutter/stapler instrument with a lockout mechanism in the 1970's in an LDS stapler. U.S. Surgical obtained a patent on this lockout mechanism in 1978 in U.S. Patent No. 4,086,-926 ("Green '926"). This device prevented firing when no staples remained. The PTO considered this device when issuing the original Fox Patent, but distinguished it from Fox. The PTO allowed Fox over Green '926, because, although Green '926 prevents firing when no staples are present, Green '926 does allows for multiple firing. Besides Green '926, the PTO considered other lockout mechanisms in surgical staplers as prior art to the Fox Patent. These include U.S. Patent Nos. 4,569,346 issued in 1986 ("Poirier"), and 4,473,077 issued in 1984 ("Noiles"), both owned by U.S. Surgical, as well as U.S. Patent No. 4,254,251 ("Moshofsky"). Indeed, the Examiner of the Fox Reissue Patent considered 23 prior art references. Thus, surgical stapler lockout mechanisms constitute a "crowded art," in which recent patents, like the Fox Reissue Patent, are not broadly construed, but rather, are limited to the specific structures disclosed therein and a narrow range of equivalent structures.

### III. The Devices At Issue

17. Ethicon and U.S. Surgical each market surgical devices called linear cutters. In fact, we understand that these parties are in effect the only manufacturers of the type of cutters which are involved in this suit. Linear cutters are used by surgeons to cut body tissue while simultaneously stapling the tissue closed on both sides of the incision in order to prevent excessive bleeding. After each cut, the staples are depleted so the surgeon must reload the cutter to avoid cutting without the benefit of staples. The particular devices which are the subject of this case are mechanisms for preventing the surgeon from accidentally using the device without staples. This is accomplished by a "lockout" safety device which makes it impossible to reuse the cutter without reloading. Both the parties linear cutters have lockout devices and each are covered by patents.

18. There are two general types of linear cutters, designed for different types of surgery. Open linear cutters are used in conventional surgery, in which the surgeon gains access to body organs through large incisions. Endoscopic linear cutters are used in endoscopic surgical procedures, in which the surgeon makes only a small puncture wound and performs the surgery through a tube (a trocar), using elongated instruments, while viewing the affected area by means of a miniature camera, also inserted through a trocar.

### VI. Introduction Of The Devices To The Market

19. U.S. Surgical first introduced its GIA linear cutter/stapler without a lockout mechanism in 1968. These early U.S. Surgical devices employed a "disposable loading unit". This early "disposable loading unit" was actually a unitary sterilized package which contained a separate anvil, staple cartridge and cam bar-knife assembly. The surgeon would assemble these separate disposable elements and insert them in the reusable stapler frame. In the 1980's, for the convenience of the surgeon, U.S. Surgical combined these elements into one device called a DLU, which contained both the staple cartridge and the cam bar-knife assembly, which in their earlier devices were not joined, but separate pieces, packaged together. U.S. Surgical continued to distinguish between the staple

cartridge and the cam bar-knife assembly, as distinct elements of the DLU.

20. In October 1989, U.S. Surgical introduced to the market the first linear cutter with a lockout mechanism (its 60mm cutter). This was three months before the Fox Patent's first issue, and more than four years before the Fox Reissue Patent. U.S. Surgical introduced its 80mm device with a lockout in early 1990.

21. In August 1991, Ethicon introduced a 75mm open linear cutter . with a lockout mechanism, almost two years after U.S. Surgical's first lockout in a linear cutter/stapler, and more than a decade after U.S. Surgical's first cutter/stapler lockout, the Green '926. Ethicon introduced a 55mm open cutter with a lockout in December 1991.

22. U.S. Surgical introduced a 30mm endoscopic linear cutter with a lockout mechanism in spring 1991. Ethicon and U.S. Surgical both introduced 60mm endoscopic cutters with lockout mechanisms in fall 1992. Ethicon introduced its 35mm endoscopic cutter in May 1993.

## V. The 1990 Meetings Between Ethicon And U.S. Surgical Concerning The Fox Patent

23. In June 1990, Johnson & Johnson's chief patent counsel, Robert Minier, acting on Ethicon's behalf, sent a letter to U.S. Surgical's General Counsel, Thomas Bremer, stating that U.S. Surgical's linear cutters infringed the original Fox patent.

24. Mr. Minier, and another Johnson & Johnson patent lawyer, Paul Coletti, acting on behalf of Ethicon, then met with Mr. Bremer and with U.S. Surgical's in-house patent counsel, John Andres, twice, first in July, 1990 and then again in September, 1990. During the meetings, U.S. Surgical's counsel asserted that the original Fox patent was not infringed and was invalid in view of certain prior art.

25. The parties did not reach agreement in the course of the two meetings.

## VI. The Fox Reexamination Proceeding

26. In November 1990, Ethicon requested that the PTO reexamine the original Fox patent.

27. In January 1991, the PTO denied the request for reexamination.

28. The PTO reconsidered its denial of the request for reexamination and on March 16, 1991, granted *sua sponte* the request and proceeded to reexamine the Fox patent.

29. On July 2, 1991, the PTO examiner confirmed the patentability of all claims of the original Fox patent and issued his reasons for confirming the patent.

## VII. The Fox Reissue Proceeding

30. 35 U.S.C. § 251 provides for reissuance of a previously issued patent for specified reasons:

"Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent."

31. Ethicon filed an application with the PTO for reissue on December 31, 1991.

32. In making its application for reissue, Ethicon stated that:

The error in connection with claims 4–12 of [Fox's] patent, by which declarants claimed less than they had a right to claim, was determined to exist in connection with reexamination of the subject patent, and examination of a United States Surgical stapler apparatus. In connection with this study, it was realized that the construction of the United States Surgical apparatus, as disclosed in U.S. Patent No. 5,031,814, to Tompkins et al., incorporated declarants' invention, but such a construction could be asserted as not falling within the scope of claims 4–12 of their patent. (Reissue Application Declaration at 4).

33. In particular, Ethicon stated in its application for reissue:

Claim 6, while more broadly directed to a pusher-bar/lockout mechanism assemblage wherein the lockout mechanism prevents the pusher bars from passing more than one time through the cartridge, can be interpreted as requiring declarants' novel lockout mechanism in the staple cartridge itself, while it is within the purview of [Ethicon's] invention to embody their invention in a construction wherein all features of the lockout mechanism are not necessarily incorporated in the staple cartridge. (Reissue Application Declaration at 3–4).

34. Ethicon added Claim 24 (then numbered Claim 37) to the Fox reissue application on August 13, 1992.

35. The PTO issued the Fox reissue patent on January 25, 1994. In the Fox Reissue Patent, some of the original claims, including Claim 1 were excluded, some proposed new claims were excluded, and some new claims were allowed.

36. At the time the Fox patent was reissued, U.S. Surgical's cutter/staplers with the allegedly infringing lockout device were in daily use by surgeons throughout the world for over four years.

## VIII. The Claims Of The Fox Reissue Patent At Issue

37. Two claims in the Fox Reissue Patent are at issue on this motion. Claim 6 of the Fox Reissue Patent is identical to Claim 6 in the original Fox patent. Claim 6 reads as follows:

In a staple cartridge insertable within a surgical stapler and containing staples and comprising an elongated body including one or more longitudinal slots for slidably receiving one or more longitudinal pusher bars comprising a firing mechanism of said surgical stapler, and a plurality of drivers engageable by said pusher bars for ejecting the staples from the cartridge, said staple cartridge releasably fastened to a said surgical stapler, the improvement comprising a lockout mechanism connected to said longitudinal slots for preventing said pusher bars from passing more than one time through said longitudinal slots.

38. The other claim at issue is Claim 24 which Ethicon added in its the reissue application. Claim 24 reads as follows:

A surgical stapler comprising:

a frame, a cartridge filled with staples and positionable in operative association with said frame and having one or more slots,

a firing assemblage including a pusher assembly movable relative to said frame, said pusher assembly comprising one or more pusher bars respectively extending through said slots to fire said staples,

a member operatively connected to said pusher assembly for moving the pusher assembly in a firing direction down a path to fire the staples, and in a direction opposite to said firing direction to a retracted position after at least a portion of the staples have been fired,

a lockout mechanism for preventing firing movement of the pusher assembly in the firing direction after the pusher assembly has been moved to the retracted position,

said lockout mechanism including a barrier assemblage for preventing movement of the pusher assembly from said retracted position, "said barrier assemblage comprising a resilient "projecting member normally biased toward a position to engage said pusher assembly to prevent of movement of said pusher assembly relative to said resilient projecting member after said pusher assembly has been moved to said retracted position,

and a restraining structure separate from said pusher bar for blocking said barrier assemblage to maintain said resilient projecting member out of the path of the pusher assembly during staple firing,

said restraining structure being movable by said pusher assembly during movement of the pusher assembly in the firing [direction] "whereby the barrier assemblage is released to allow the resilient projecting member to move into the path of the pusher assembly to prevent firing movement of said pusher assembly after movement thereof to said retracted position."

## CONCLUSIONS OF LAW

Ethicon claims that both the U.S. Surgical open linear cutter/staplers and the endoscopic linear cutter/staplers infringe Claims 6 and 24 of the Fox Reissue Patent. We will consider the claims and cutters individually.

### I. Claim 6 and the U.S. Surgical Open Linear Cutters

Ethicon claims that U.S. Surgical's open linear cutters directly infringe on Claim 6 of the Fox Reissue Patent. The construction of Claim 6 for purposes of comparison with the U.S. Surgical device alleged to infringe that claim hinges upon the interpretation of two key elements. They are: first, the scope of the term "staple cartridge," and second, the significance of the term "connected to."

#### (A) *STAPLE CARTRIDGE*

 U.S. Surgical claims the lockout in its open linear cutters is not in the staple cartridge, but rather in the "disposable loading unit" ("DLU"), which they contend is distinguishable from Ethicon's staple cartridge. Ethicon insists that the U.S. Surgical's disposable loading unit is actually a staple cartridge. Ethicon makes a very convincing argument that U.S. Surgical's DLU functions in a manner which in common parlance could be characterized as a cartridge. It is intended to be inserted and removed from a larger instrument, much like a cartridge for a VCR or a ball point pen. However, in the context of a patent, an inventor is his own lexicographer. *United States v. Telectronics, Inc.,* 857 F.2d 778, 781–82 (Fed. Cir.1988). The meaning of any individual term in a claim is defined by the context of the patent itself. The Court must ascertain the meaning of words in a claim by interpreting the words "with regard to the other claims, the specification, and the prosecution history." *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1056 (Fed.Cir.1988). Therefore, our inquiry is not simply whether U.S. Surgical's DLU functions as a cartridge in the ordinary layman's understanding of the term, but rather whether the U.S. Surgical's DLU reads on Ethicon's cartridge as defined in the Fox Reissue Patent. In our Order denying Ethicon's Motion for a Preliminary Injunction, we conducted an extensive discussion of this issue. *Ethicon Endo–Surgery v. United States Surgical Corp.,* 855 F.Supp. at 1509–13. Having once again considered the matter in great depth, we are satisfied that our original interpretation of Claim 6 was correct. In our original holding, we relied primarily upon the language of claim itself, applying the same general rules of construction as any other written instrument. *See Merrill v. Yeomans,* 94 U.S. 568, 571, 24 L.Ed. 235 (1877) (patent interpretation requires the use of "well-settled rules of construing all instruments").

Claim 6 states:

6. In a **staple cartridge** insertable within a surgical stapler and containing staples and **comprising** [1] *an elongated body* including one or more longitudinal slots for slidably receiving one or more longitudinal pusher bars comprising a firing mechanism of said surgical stapler, and [2] *a plurality of drivers* engageable by said pusher bars for ejecting the staples from the cartridge, said staple cartridge releasably fastened to a said [sic] surgical stapler, the improvement comprising [3] *a lockout mechanism* connected to said longitudinal slots for preventing said pusher bars from passing more than one time through said longitudinal slots.

United States Patent No. Re. 34,519 (the "Fox Reissue Patent"), Column 5, Lines 47–58 (emphasis supplied). As our emphasis indicates, the elements of the staple cartridge listed in Claim 6 in addition to the staples themselves are (1) an elongated body, (2) a plurality of drivers and (3) a lockout mechanism. The elongated body is further described as "including one or more longitudinal slots." The slots are designed "for slidably receiving one or more longitudinal pusher bars" which comprise the "firing mechanism of said surgical stapler." In practice, the stapler works by inserting the pusher bars in the longitudinal slots, displacing the drivers, which in turn push the staples through the tissue. The staples then contact an anvil which causes them to bend and seal.

The issue as Ethicon frames it is whether U.S. Surgical's DLU is really the Fox Reis-

sue Patent's "cartridge" with additions. If so then the U.S. Surgical lockout device, located in the DLU would be located in the cartridge and would therefore read on the Fox Reissue Patent. U.S. Surgical contends that the cartridge of the Fox Reissue Patent is analogous to the "cartridge assembly" in their device. The cartridge assembly is a part of their DLU which contains the staples, drivers and which receives the pusher bars. U.S. Surgical's cartridge assembly does not contain a lockout mechanism, but rather it is located at the opposite end of the DLU. We are satisfied that U.S. Surgical's construction of "staple cartridge" is correct.

First, the wording of Claim 6 describes the staple cartridge as comprising longitudinal slots for receiving longitudinal pusher bars. These pusher bars are the firing mechanism for engaging the drivers and thus ejecting the staples. This description by our reading depicts the pusher bars as separate entities from the staple cartridge. Ethicon argues that since Claim 6 uses the patent term of art "comprising," we should conclude that the staple cartridge is not limited to the elements delineated in the claim. *See Berenter v. Quigg,* 737 F.Supp. 5, 6–7 (D.D.C.1988) ("The word 'comprising' means the recited elements are only a part of the device; therefore, the claim is open.") However, the term of art simply indicates that elements not enumerated may be included in the category as "comprised." We agree with Ethicon that its staple cartridge can be comprised of more than slots, but we interpret the language

> **comprising** [1] *an elongated body* including one or more longitudinal slots for slidably receiving one or more longitudinal pusher bars comprising a firing mechanism of said surgical stapler

to indicate that the pusher bars are outside the staple cartridge. When elements are specifically described in a claim as separate and distinct, it would be inconsistent to assume that the author intended the one to be included in the other.

This reading is also consistent with the historical development of the U.S. Surgical device. The 1970's version of that device came with the package of disposable parts including a separate anvil, staple cartridge and cam bar-knife assembly. The package was labeled a "disposable loading unit." The surgeon would assemble these parts manually. Later U.S. Surgical combined the staple cartridge and cam bar-knife assembly elements into a DLU. However, they have retained the language "cartridge" or "staple cartridge" to refer to the plastic piece which contains the staples, staple drivers and slots for receiving the cam bars. This staple cartridge remains a distinct sub-element of the DLU.

In our previous decision, we found additional evidence of this in the specification of the Fox Reissue Patent. *See Ziggity Systems, Inc. v. Val Watering Systems,* 769 F.Supp. 752, 784 (E.D.Pa.1990) (holding that a court can turn to the specifications and drawings in order to aid it in understanding the scope and meaning of the language employed in the claims). The inventor is allowed considerable latitude in the use of terminology, but words must be used in the same way in both the claims and the specification. *United States v. Telectronics, Inc.,* 857 F.2d at 781–82. Our limited reading of the meaning of cartridge in the Fox Reissue Patent is reinforced by the language of the specification:

> [A] typical surgical stapler will have an upper jaw, firing means, a lower jaw ... and a staple cartridge which fits within the lower jaw.... The firing means will generally comprise a pusher bar or firing wedge.... The firing means will also contain a knife which generally will be placed between the firing wedges.... When the firing wedge travels through the staple cartridge, and its activating drivers, it will come into contact with a lockout mechanism.

United States Patent No. Re. 34,519 (the "Fox Reissue Patent"), Column 2, Lines 45–54, Column 3, lines 2–5 (reference numbers omitted). Here again the staple cartridge is described as distinct from the pusher bar(s). The pusher bars travel through the staple cartridge. Our reading of Claim 6 leads us to conclude that in the context of the Fox Reissue Patent, the term staple cartridge has a specific meaning and that it does not include the firing means or pusher bar(s).

We are satisfied that our reading of Claim 6 is required by the language of the claim itself, as interpreted in the context of the remainder of the patent, in particular the specification. However, at the August hearing Ethicon presented cogent challenges to our reading. Ethicon's technical expert Dr. Collins testified that to one knowledgeable in the art, the staple cartridge in the Fox Patent was the same as U.S. Surgical's DLU. Dr. Collins demonstrated that some of U.S. Surgical's early patents seem to use the terms "cartridge" and "DLU" interchangeably. *See for example* United States Patents No. 4,520,817 & 4,127,227 ("Green '817 & '227"). Additionally, these Green patents apparently allow for the inclusion of pusher bars in the cartridge. Mr. Green himself in his deposition testimony seems to use the terms "DLU" and "cartridge" interchangeably.

U.S. Surgical responds to Dr. Collins testimony by making a distinction between the generic term cartridge, which admittedly describes its DLU and the more precise term "staple cartridge" as used in the Fox Patent. This is in line with our initial finding that the generic meaning of "cartridge" is not determinative of the same term used in the disputed patents. We have already concluded that both terms "staple cartridge" in Fox Patent and "DLU" in the Tompkins Patent are more restrictive than "cartridge" in the generic sense.

Finally, Dr. Collins raises a credible issue from the Fox prosecution history. Dr. Collins demonstrated how the PTO rejected claims in the original Fox Patent application citing as prior art the Noiles '077 Patent, which contains a lockout off the cartridge. Dr. Collins testified that since the examiner cited this patent as prior art, then he must have determined that Fox allowed a lockout outside the cartridge. U.S. Surgical's expert Mr. Nusbaum, who worked in the patent office for 17 years, agreed that some statements of the PTO in the Fox Reissue Patent prosecution history were inconsistent with U.S. Surgical's position. However, he was able to explain how the prosecution history taken as a whole supported the interpretation that the Fox Reissue Patent described a lockout mechanism in a staple cartridge.

In the process of our in-depth analysis of the Fox Reissue Patent prosecution history, inconsistencies were demonstrated by both Parties. If anything we gained an appreciation for the complex and difficult job of the patent examiner. It became evident that the patent application process involves a series of interactions between the applicant and the patent office. We came to realize that it is impossible to reconcile all the implications and inferences which could be made, based on the actions taken by the PTO in the extensive Fox Reissue Patent prosecution history. This rather unusual prosecution history includes: the original application and approval, a request for reexamination, the PTO's denial of that request, the PTO *sua sponte* reconsideration and subsequent reexamination, the reissue proceedings and subsequent reissue, as well as several interference actions. This realization reassured us that fundamentally it is the actual language of the patent itself which should be our primary focus. Additionally, the prosecution history, taken as a whole, strongly supports our reading.

As we noted above, the implications which could be drawn from the Fox Reissue Patent prosecution history are at times difficult to reconcile, but one statement of the PTO seems particularly clear. The PTO, upon reexamination, reconfirmed all twelve of the original Fox Patent claims, in a document dated July 7, 1991. This document, cited by both sides says in pertinent part:

> The claims are confirmed because the prior art of record do not disclose or suggest a surgical staple cartridge comprising a lockout mechanism connected to longitudinal slots of the cartridge in the manner set forth in claim 6 wherein the lockout mechanism prevents the pusher bars from passing more than once through the longitudinal slots.
>
> All of the references cited by the patent owner, with the exception of the Poirer reference and Auto Suture booklet, disclose devices having a lockout mechanism that allow its pusher bars to pass more than one time through the longitudinal

slots. The devices shown by Poirier and the Auto Suture booklet do not have a lockout mechanism in the cartridge.

Notice of Intent to Issue Reexamination Certificate, United States Patent No. 4,892,244, July 7, 1991, Defendant's Memorandum in Opposition, Exhibit 14, Document 11. Our reading of this statement is that the PTO distinguished Fox from the prior art for two reasons: because the lockout is in a cartridge and because it prevents multiple firing.

### (B) *"CONNECTED TO"*

■ Our initial understanding of the meaning of Claim 6 was reinforced by the last four lines:

> the improvement comprising a lockout mechanism *connected to said longitudinal slots* for preventing said pusher bars from passing more than one time through said longitudinal slots.

Patent No. Re. 34,519 (Fox Reissue Patent) Column 5, Lines 55–58 (emphasis added). Claim 6 recites a lockout mechanism "connected to said longitudinal slots." In our earlier order, we interpreted this to mean directly connected to the slots. As we have noted the lockout device in the U.S. Surgical cutter never touches either the longitudinal slots or the pusher bars, but rather attaches to the cam bar retainer. Ethicon argues for a different interpretation of "connected." Ethicon asserts that the U.S. Surgical lockout is connected to its longitudinal slots, since one of the walls of its longitudinal slots is defined by a metal sheet which if followed beyond the longitudinal slots will eventually connect with the hooking clip. However, by this logic every piece of a linear stapler is eventually connected to every other piece. In order to give substantive meaning to the assertion in the Fox Patent that the lockout is connected to the longitudinal slots, we must understand this to mean directly or operably connected. Since the longitudinal slots are part of the Fox Patent's cartridge, this reading of the term connected would require that the claimed lockout be part of the cartridge. Therefore, we interpreted these last four lines of Claim 6 to reinforce our reading of that entire claim. Claim 6 of the Fox Patent describes a lockout in a sta-

ple cartridge, directly and operably connected to the longitudinal slots. The allegedly infringing device of U.S. Surgical is a lockout which is outside the cartridge and which is not connected to the longitudinal slots.

At our August hearing, Ethicon presented a host of examples of the use of the expressions "connects," "connection," and "connecting." *See for example* U.S. Surgical's Patent No. 4,488,523 ("Schichman") and Patent No. 5,071,052 ("Rodak"). Ethicon apparently chose these examples to demonstrate that two elements of a mechanical device which were relatively far apart could be considered connected to each other. We find these arguments unconvincing. In each of the cases cited by Ethicon, the connection was described because that connection had some functional relevance to the operation of the device. For example, in the Schichman Patent we see this language:

> The apparatus [10] includes an actuator [14], an applicator section [12] for applying the fasteners and a transversely flexible shaft [16] *connecting* the applicator [12] and the actuator [14].

It is true that the flexible shaft in Schichman is long and connects elements relatively distant from each other, but the functional import of the connection is obvious and the actual connection is direct. In order to give this same meaning to "connected to" in the Fox Reissue Patent, we must understand "connected to" to mean that the lockout is directly and functionally connected to the longitudinal slots. Such a reading would exclude the relationship between the slots and the lockout practiced by U.S. Surgical.

The term "connected to" was not casually chosen by Fox. That language was supplied in response to an objection by the PTO that the applicant must be more specific in terms of the location of the lockout, and how it functioned. Therefore, we can be assured that a technical and not a generic meaning should be attached to that language.

### (C) *IMPLICATIONS FROM REISSUE*

■ If Ethicon believed that Claim 6 provided the scope that Ethicon now asserts, it is difficult to understand why it would not

have immediately asserted its right of infringement. Instead Ethicon asked the PTO to reissue the Fox Patent, with expanded claims. To convince the PTO to undertake reissue Ethicon was required to explain the reasons why they were seeking reissue, including the reasons why they believed the existing patent failed to accurately articulate the actual invention. In doing so Ethicon stated:

> Claim 6, while more broadly directed to a pusher bar/lockout mechanism assemblage wherein the lockout mechanism prevents the pusher bars from passing more than one time through the cartridge, can be interpreted as requiring declarants' novel lockout mechanism in the staple cartridge itself, while it is within the purview of declarants' invention to embody their invention in a construction wherein all features of the lockout mechanism are not necessarily incorporated in the staple cartridge. Claims 6, and claims 7, 8, 9, 10, 11, and 12 depending therefrom of their patent, are therefore insufficient in providing a breadth of protection commensurate with declarants' invention.

> \* \* \* \* \* \*

> [I]t was realized [during the re-examination] that the construction of the United States Surgical apparatus, as disclosed in U.S. Patent No. 5,031,814, to Tompkins et al., incorporated declarants' invention, but such a construction could be asserted as not falling within the scope of claims 4–12 of their patent.

Reissue Application Declaration, Patent No. 4,892,244 at 3–4, Defendant's Memorandum in Opposition, Exhibit 19, Document 11. We see from the Plaintiff's Reissue Application Declaration that Ethicon at least recognized the limitations of Claim 6 which we have documented above.

Ethicon asserts that the Fox invention is of pioneering significance and deserves a very broad reading. Essentially they assert that the invention described in Claim 6 is any lockout device which prevents the passage of the pusher bars more than once through a cartridge. But our own analysis of the language of Claim 6 leading to a narrower read-

ing is reinforced by Ethicon' own statements made to the PTO.

## II. Claim 24 and the U.S. Surgical Open Linear Cutters

■ We have seen that Ethicon's own concerns about the scope of Claim 6 led it back to the PTO seeking reissue. Since Claim 6 was unchanged, we must look to the new claims allowed upon reissue to determine whether the PTO agreed with Ethicon assertion that the Fox invention was broader that expressed in the claims of the original Fox Patent. If so, we would expect to find in the new claims a clear delineation of the protection which Ethicon was seeking, particularly in regard to Ethicon's stated intention for seeking Reissue—to bring the lockout devices practiced by U.S. Surgical into the scope of the Fox Reissue Patent.

Ethicon contends that such a clarification is found in Claim 24 of the Fox Reissue Patent. We indicated while denying Ethicon's Motion for a Preliminary Injunction that we found Claim 24 ambiguous and difficult to understand. One thing can be said for certain. If the Patent Office intended a sweeping affirmation of Ethicon's assertions, it certainly could have found more definite language for doing so than that contained in Claim 24. There was testimony that such language was proposed, but rejected by the PTO. Instead, we have a claim which introduces a whole new vocabulary, undefined and found nowhere in the specifications or drawings.

When confronted with this problem in consideration of Ethicon's Motion for a Preliminary Injunction we stated:

> It is virtually impossible to resolve this dilemma on purely linguistic grounds. The ambiguity makes either the reading urged by the Plaintiff or by the Defendant possible. However, to accept Ethicon's interpretation we must believe that the PTO, in reissuing the Fox Patent, intended to significantly expand the scope of that patent.

*Ethicon v. U.S. Surgical*, 855 F.Supp. at 1514–15. At our recent hearing we were able to take a much closer look at the file history and from this we were convinced that

the PTO did not intend to grant sweeping new scope in reissuing the Fox Patent.

Initially, we must recognize that new Claim 24 must be understood in light of the other claims and the entire file history of the Fox invention. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d at 1056 (holding that in order to understand patent claims a court can take instruction from the other claims, the specification and the prosecution history). Therefore, the terms used in Claim 24 must be understood in light of the patent as a whole. In this respect Claim 24, is particularly difficult. As noted, Claim 24 introduces a whole new vocabulary, which is not found in the original Fox patent. Significant among the new terms are "firing assemblage," where we originally saw "firing means" and "firing knob;" "pusher assembly," where we once saw "pusher bar(s)" or "firing wedge;" and introducing "barrier assemblage," "resilient projecting member," and "restraining structure."

Just as the interpretation of Claim 6 turned largely on the scope given to the term "cartridge," the interpretation of Claim 24 turns largely on the scope given to the term "pusher assembly." Since "pusher assembly" is not used in the original Fox Patent, this creates a difficult job for anyone trying to construe Claim 24. In a nutshell, Claim 24 describes a lockout device which consists of a "resilient projecting member" which "move[s] into the path of the pusher assembly to prevent firing movement of said pusher assembly after movement thereof to said retracted position." Patent No. Re. 34,519 (Fox Reissue Patent), Column 10, Lines 1–3.

If pusher assembly is interpreted broadly, as Ethicon urges, then it could be understood to be analogous to both U.S. Surgical's cam bars and cam bar retainer. Under this interpretation the U.S. Surgical cutters could be seen as infringing the Fox Reissue Patent because U.S. Surgical's lockout functions by snapping over a notch in the cam bar retainer. U.S. Surgical insists that the new term "pusher assembly" is simply a synonym for "pusher bars." In that case there would be no infringement, because the U.S. Surgical lockout does not move into the path of the pusher bars.

As with our analysis of Claim 6, we must rely primarily on the words of Claim 24 itself, applying the same general rules of construction as any other written instrument. *See Merrill v. Yeomans*, 94 U.S. at 571. Initially, we note that Claim 24 describes a lockout in a surgical stapler, thus escaping the limitations created by Claim 6's requirement that the lockout be in the staple cartridge. To determine the meaning of "pusher assembly" we first must analyze the language:

> a firing assemblage including a pusher assembly moveable relative to said frame, said pusher assembly comprising one or more pusher bars respectively extended through said slots to fire said staples,
>
> a member operatively connected to said pusher assembly for moving the pusher assembly in a firing direction down a path to fire the staples . . .

Though pusher assembly is nowhere defined, save that it includes pusher bars, we do know that it is included in the firing assemblage. Unfortunately, firing assemblage is also undefined. Claim 6 does contain the language "pusher bars comprising a *firing mechanism*." If "firing assemblage" and "firing mechanism" are the same, then we can infer that the pusher bars and firing mechanism are one and the same.

To continue, all Claim 24 tells us about the pusher assembly is that it comprises one or more pusher bars. Ethicon correctly argues that the term of art "comprising" indicates that the pusher assembly could contain other elements. However, "comprising" can also mean "contains" or simply, "is." Here again, we are faced with language which certainly makes no affirmative expansion of the meaning of pusher assembly, but is open ended enough to allow a more expansive interpretation.

> Finally, we look to the language
>
> a member operatively connected to said pusher assembly for moving the pusher assembly in a firing direction down a path to fire the staples . . .

If we are to agree with Ethicon's contention that its pusher assembly contains more that the pusher bars, then how are we to inter-

pret this "member" which is connected to the pusher assembly for the purpose of moving the pusher assembly. We construe this member to be analogous to among other things the cam bar retainer of U.S. Surgical's device. Ethicon argues that this member is the "firing knob." If that is so, then why not simply use that term which is clearly delineated in the specification and drawings. Instead we are faced with another ambiguous term, which arguably can be interpreted as Ethicon suggests, but is at least as amenable to U.S. Surgical's construction. Again we return to the view that since Ethicon sought reissue for the specific purpose of extending Fox's invention to cover U.S. Surgical's lockout, some unambiguous disclosure of that coverage should be found in Claim 24. We interpret the ambiguous term "pusher assembly" to mean the same as "pusher bars" or "firing wedges." Therefore, the Fox Reissue Patent describes a lockout which functions by obstructing the pusher bars. U.S. Surgical's device does not infringe such a lockout.

We find reinforcement for our reading in the prosecution history of the Fox REissue Patent and in other actions by the PTO. We noted above that Claim 24 avoided the restriction in Claim 6 by describing a lockout in a stapler rather than a staple cartridge. However, we also note that there is clear evidence from the reissue proceedings that the reissue examiner did not contemplate a lockout outside the cartridge. In rejecting Claim 1 the examiner stated:

> [T]here is no support in the [Fox] specification for a lockout mechanism that is mounted to the stapler.... The disclosed mechanism is mounted to the cartridge.

Examiner's Action, July 12, 1992, Defendants Exhibit CC at 3–4. The examiner further states that Claim 1 must be rejected because:

> Claim 1 implies that the lockout mechanism is not part of the cartridge.

*Id.* at 4. We are satisfied that our limited reading of Claim 24 is more consistent with these statements of the examiner than a more expansive reading.

During the reissue proceedings, Ethicon requested an interference with U.S. Surgical's Tompkins Patent. The interference was denied, presumably on the basis that the PTO believed that the two devices did not describe the same invention. In seeking the interference, Ethicon submitted a chart showing corresponding features of the two patents. Ethicon compared Tompkins' "pusher assembly" with its "pusher bar," while equating Tompkins "cam bar retainer" with its "firing means." Request for Declaration of Interference, Defendant's Exhibit AA at 5–6. This is significant because U.S. Surgical's lockout infringes Claim 24 only if the cam bar retainer is part of Claim 24's "pusher assembly."

Having adopted a limited interpretation of "pusher assembly," which does not include the cam bars, it follows that U.S. Surgical's device does not infringe Claim 24. The U.S. Surgical device functions by blocking the forward movement of the cam bar retainer. Claim 24 recites a resilient projecting member which moves "into the path of the pusher assembly to prevent firing movement...."

Ethicon stated to the PTO that at least one of its reasons for seeking reissue of the Fox Patent is to cover the U.S. Surgical lockout. However, we need not assume that the approval of new Claim 24 indicates a confirmation on the part of the PTO of Ethicon's asserted reasons for seeking reissue. The reissue examiner examined all the proposed claims. He accepted and rejected some of the claims of the original Fox Patent. He accepted and rejected some of the new claims proposed upon reissue. Our job has been to construe surviving Claims 6 and 24. In doing so we have relied primarily on the language of those claims, in the context of the other claims and the specification, including the drawings. We have also taken instruction from the prosecution history, including the rejection of certain claims upon reissue.

### (C) Claim 6 and 24 and the U.S. Surgical Endoscopic Cutters

█ Ethicon also argues that U.S. Surgical's endoscopic cutters infringe on Claims 6 and 24 of the Fox Reissue Patent. However, as we noted in our Preliminary Injunction Order, U.S. Surgical's endoscopic cutters employ a wholly different lockout device than the one practiced in its open cutters. Essen-

**186**

tially, the endoscopic devices prevent refiring not by obstructing the pusher bars from being reinserted into the longitudinal slots, but rather by leaving the pusher bars in the forward position. This is accomplished by causing the pusher bars and the knife blade to separate from the apparatus that drives the pusher bars forward. In addition rather than restraining the driver apparatus by a resilient spring type device, the driver itself is resilient and the retaining device is fixed. In order to find that these endoscopic cutters infringe the Fox Reissue Patent, we would have to take a much broader view of Fox's claims than our analysis has revealed. Accordingly, we find no infringement by the lockouts on the U.S. Surgical endoscopic devices.

## INTERVENING RIGHTS

New claims in a reissue patent are effective retroactively, from the date of the original patent. Therefore, a situation can arise in which a party may find that they have been infringing patent claims, that were not in existence at the time of the infringement. However, we note that the Patent Statute provides protection to a party in this situation. Where between the time of issuance of an original patent and issuance of a reissue patent, an individual produces and sells a device which did not infringe the original patent, but which did come within the reissue patent, the infringer acquires intervening rights which the holder of the patent cannot disturb. 35 U.S.C. § 252; *Sontag Chain Stores Co. v. National Nut Co. of California,* 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204 (1940). A district court may also provide for continued manufacture, use or sale of the device "of which substantial preparation was made, prior to the grant of reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue." 35 U.S.C. § 281 (1940). Having determined that there is no infringement of the Fox Reissue Patent, we need not determine to what intervening rights U.S. Surgical may be entitled. If we had found infringement of Claim 24, such equitable relief would have been appropriate.

## CONCLUSION

We are confident that the plain language of Claim 6 of the Fox Reissue Patent is not infringed by U.S. Surgical's lockout devices. Ethicon's own stated reasons for seeking reissue affirm this finding. Looking to Claim 24, we find pervasive ambiguity, but no solid support for the expansive reading Ethicon urges upon us. From our recent week long hearing, we are convinced that this is a "crowded art," where such expansive construction is imprudent.

We determine that U.S. Surgical's accused lockout device does not infringe upon Claims 6 and 24 of the Fox Reissue Patent. Accordingly, Plaintiff/Counterclaim Defendant Ethicon's claims are DISMISSED with prejudice. Defendant/Counterclaim Plaintiff U.S. Surgical's Counterclaims are DISMISSED without prejudice, in accord with its request made during the August hearing.

SO ORDERED.